**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Greenbelt Division**

| | | |
|---|---|---|
| FRANCISCO J. PEREZ GUNDIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No._____ |
| | ) | |
| | ) | |
| TERRAFORM GLOBAL, INC., | ) | |
| 7550 Wisconsin Avenue, 9th Floor | ) | |
| Bethesda, Maryland 20814 | ) | |
| | ) | |
| Serve Registered Agent: | ) | |
| Corporation Service Company | ) | |
| 2711 Centerville Rd., Suite 400 | ) | |
| Wilmington, DE 19808, | ) | |
| | ) | |
| TERRAFORM POWER, INC., | ) | |
| 7550 Wisconsin Avenue, 9th Floor | ) | |
| Bethesda, Maryland 20814 | ) | |
| | ) | |
| Serve Registered Agent: | ) | |
| Corporation Service Company | ) | |
| 2711 Centerville Rd., Suite 400 | ) | |
| Wilmington, DE 19808, | ) | |
| | ) | |
| AHMAD CHATILA, | ) | |
| 24931 Prospect Avenue | ) | |
| Los Altos Hills, CA 94022-5107, | ) | |
| | ) | |
| BRIAN WUEBBELS, | ) | |
| 11663 O'Sanna Lane | ) | |
| Highland, IL  62249, | ) | |
| | ) | |
| MARTIN TRUONG, | ) | |
| 12371 Ironstone Road | ) | |
| St. Louis, MO 63131, | ) | |
| | ) | |
| EMMANUEL HERNANDEZ, | ) | |
| 3467 Malibu Terrace | ) | |
| Fremont, CA  94539, | ) | |
| | ) | |
| and | ) | |

PETER BLACKMORE,                                          )
     50 Barry Lane                                       )
     Atherton, CA 94027                          )
                                        )
                      Defendants.               )

## COMPLAINT AND JURY TRIAL DEMAND

Plaintiff Francisco J. Perez Gundin ("Mr. Perez") brings this action against his former employers, TerraForm Global, Inc. ("GLBL") and TerraForm Power, Inc. ("TERP"), as well as individual defendants Ahmad Chatila, Brian Wuebbels, Martin Truong, Emmanuel Hernandez and Peter Blackmore (the "Individual Defendants"). The Individual Defendants are all present or former senior officers and directors of GLBL, TERP, and/or their controlling parent company, SunEdison, Inc. ("SUNE" and, together with GLBL and TERP, the "Companies"). Mr. Perez – the former Chief Operating Officer ("COO") of GLBL and TERP, as well as a former Executive Vice President ("EVP") and COO of SUNE – asserts claims under federal law for violation of whistleblower protection provisions, as well as claims for promissory estoppel and breaches of the implied covenant of good faith and fair dealing.

In support of his claims, Mr. Perez makes the following allegations upon personal knowledge as to himself and his own acts, and upon information and belief (including review of publicly available information) as to all other matters, and alleges as follows:

## OVERVIEW OF THE ACTION

1.        This case arises out of the retaliatory termination of Mr. Perez's employment after he raised concerns to each of the Companies' Board of Directors and others about financial mismanagement, false reporting of financial results and forecasts, and other misconduct by each of the Defendants, and refused to partake in unauthorized transactions between and among the

2

Companies.  As discussed below, each of the Individual Defendants conceived and/or knowingly acted in furtherance of the financial misconduct at issue, which ultimately resulted in the financial collapse and bankruptcy of SUNE, severe losses to Defendant GLBL, and billions of dollars of losses to the Companies' public shareholders.

2.      In the Fall of 2015, as SUNE was rapidly descending into a liquidity crisis, Defendant Chatila, the Chief Executive Officer ("CEO") of SUNE, and Defendant Wuebbels, the Chief Financial Officer ("CFO") of SUNE, embarked on a two-pronged effort to save themselves from the looming consequences of their mismanagement.  For one, in order to buy time, Chatila and Wuebbels began falsely reporting SUNE's actual and projected cash holdings.  These false reports were made both internally to SUNE's other senior officers and directors and externally to the investing public.  Second, Chatila and Wuebbels, with the assistance and support of SUNE's General Counsel and Corporate Secretary, Defendant Truong, proposed a series of self-dealing transactions between SUNE and its partially-owned but wholly-controlled subsidiaries – GLBL and TERP – designed to siphon hundreds of millions of dollars from the subsidiaries into SUNE's coffers to the severe detriment of GLBL and TERP's public shareholders (the "Proposed Self-Dealing Transactions").  Notably, at the time they presented the Proposed Self-Dealing Transactions, Chatila served as the Chairman of the Board of Directors of both GLBL and TERP, and Wuebbels and Truong were also members of the GLBL and TERP Boards.

3.      In October and November of 2015, Mr. Perez and three of the other most senior executives of the Companies brought various aspects of Defendants Chatila and Wuebbels' misconduct to the attention of SUNE's Board of Directors, including, among others, Individual Defendants Blackmore (Chairman of the SUNE Board's Corporate Governance Committee and a nine-year SUNE director) and Hernandez (Chairman of SUNE's Board of Directors).  During

that time, in a SUNE Board meeting and in one-on-one conversations with individual directors, Mr. Perez and others repeatedly advised SUNE's Board that Defendants' Chatila and Wuebbels appeared to be providing the company's management team, Board and the investing public with unreliable or inaccurate information about SUNE's cash position.  In each instance, the SUNE Board – including each of the Individual Defendants – failed to take any material action in response to those warnings, and ultimately took actions in furtherance of the unlawful scheme.

4.      In his capacities as COO of each of GLBL and TERP, Mr. Perez also declined to support any of the Proposed Self-Dealing Transactions after carefully evaluating each of them. Because of the self-dealing nature of those proposed transactions, neither GLBL nor TERP could proceed with any such transaction without the approval of its Corporate Governance and Conflicts Committee of GLBL or TERP (each a "Conflicts Committee").  Each of the Conflicts Committees consisted of independent directors who had no ties to SUNE.  Mr. Perez opposed the Proposed Self-Dealing Transactions because they involved "pre-payments" by GLBL or TERP without adequate security or collateral in the event of non-performance or bankruptcy on the part of SUNE.  Up to and through November 19, 2015, the GLBL and TERP Conflicts Committees declined to approve any of the Proposed Self-Dealing Transactions.

5.      On Friday, November 20, 2015 – as part of a purge labeled by Bloomberg Financial and other financial publications as the "Friday Night Massacre" – SUNE and each of the Defendants made a series of maneuvers designed to eliminate all governance impediments to SUNE's ability to improperly pull cash immediately out of GLBL and TERP.  Bereft of cash and facing an imminent call on a $100 million margin loan on that day, SUNE and the Defendants took the following measures, among others:

- SUNE, as GLBL and TERP's controlling shareholder, voted to add three new members to the GLBL and TERP Boards, and then appointed SUNE loyalists to those seats;

- Defendant Blackmore – *a nine-year member of SUNE's Board* and a close confidante of Defendant Chatila and SUNE's Chairman, Defendant Hernandez – resigned from the SUNE Board and was immediately appointed as the new, supposedly "independent" Chairman of the GLBL and TERP Boards;[1]

- Led by Defendant Blackmore, the expanded GLBL and TERP Boards replaced all members of the GLBL and TERP Conflicts Committees with Defendant Blackmore and two other newly-elected Directors who had no prior involvement with any of the Companies;

- Led by Defendant Blackmore, a majority of the expanded GLBL and TERP Boards voted to fire *without cause* the CEO and director of GLBL and TERP, Carlos Domenech Zornoza ("Mr. Domenech"), and the CFO of both companies, Alejandro Hernandez (no relation to Defendant Emmanuel Hernandez).  Like Mr. Perez, Messrs. Domenech and Alejandro Hernandez had raised significant concerns about SUNE's liquidity and financial reporting and had opposed the Proposed Self-Dealing Transactions; and

- SUNE terminated Mr. Domenech *without cause* from his position as its Executive Vice President and all other employment with any other SUNE affiliates.

6.       In response to the foregoing actions, three members of the GLBL and TERP Boards – including Mr. Perez – immediately resigned from both Boards.  All three of the resigning directors expressly advised GLBL and TERP that they had done so because, in light of the actions taken that day, they believed they could no longer protect the interests of GLBL and TERP's shareholders as members of those Boards.

7.       Having purged all governance impediments to the Proposed Self-Dealing Transactions, Defendant Blackmore – acting in collusion with the other Individual Defendants and with utter disregard for the interests of GLBL's public shareholders – immediately led the hastily-reconstituted GLBL Conflicts Committee into approving a substantially expanded version of one of those transactions.  Indeed, *within minutes* of his appointment as Chairman of

---

[1] Although no longer Chairman of GLBL and TERP, Defendant Chatila remained a member of the Boards of both subsidiaries.

GLBL's Conflicts Committee on Friday, November 20, 2015, Defendant Blackmore had GLBL wire $150 million from its bank account to SUNE in connection with that improper transaction.

8.     Later that day, Mr. Perez spoke with Defendants Blackmore and Hernandez, and explained why he could not support the actions just taken by the GLBL and TERP Boards at the direction of SUNE and the Individual Defendants.  Mr. Perez also advised Defendants Blackmore and Hernandez that it would be impossible for him to perform his duties as COO and an employee of each of the Companies, and protect the interests of the Companies' public shareholders, in the absence of meaningful investigation and corrective measures by the Companies.  At the end of his call with Defendant Hernandez, Hernandez asked Mr. Perez to speak with Defendant Chatila the following day.

9.     At the request of Defendant Hernandez, Mr. Perez spoke with Defendant Chatila on Saturday, November 21, 2015.  Chatila stated to Mr. Perez that the Board of each of the Companies was aware of, and approved, all actions Chatila had taken regarding the reporting of SUNE's financial position and all self-dealing transfers between the Companies.  Defendant Chatila then advised Mr. Perez that Chatila had agreed with SUNE's Board to resign from all of his positions with the Companies by May or June of 2016, and that Chatila wanted Mr. Perez to remain with the Companies, but in a materially reduced role, until that time.  Chatila also stated that if Mr. Perez agreed to do so, the Companies would provide him with a "good deal" with respect to severance pay and benefits.  Chatila then threatened that if Mr. Perez did not accept the offer, Mr. Perez "would not get a penny" of his entitled rights because the Companies would take the position that he had voluntarily resigned.

10.    Mr. Perez was unwilling to provide "cover" for the Companies and accept a reduced position amidst an ongoing scheme to mislead investors and improperly divert cash to

SUNE from GLBL and TERP in return for enhanced severance.  He reiterated to the Companies several times in writing over the next seven weeks that he would willingly resume performance of his duties as COO of each of the Companies if and when he received credible confirmation that the concerns he had raised had been appropriately investigated and addressed.  He also noted that, in the absence of meaningful corrective action, he could not serve effectively as a member of the executive management team of any of the Companies and, therefore, had experienced a material diminution of his duties and responsibilities due to his unwillingness to accept and cooperate with unlawful conduct.  During that time, without addressing any of the significant concerns raised by Mr. Perez, the Companies continued to insist that Mr. Perez "return to work" without condition, and told him that if he did not do so, the Companies would accept his "resignation."

11.      In an effort to create a false and misleading paper trail, the Companies also sent Mr. Perez two letters containing knowingly false statements about the actions supposedly taken in response to the allegations of Mr. Perez and others of inaccurate reporting of SUNE's liquidity position and projections.  For example, on December 4, 2015, Defendant Truong sent a letter to Mr. Perez's counsel stating that in October of 2015, **"[w]ith the assistance of outside counsel and independent auditors (KPMG)**, a detailed liquidity review was, in fact, conducted, and the allegations were found to be without merit."  In fact, KPMG had no involvement whatsoever in conducting or supporting the liquidity review described in Defendant Truong's letter to Mr. Perez.  As counsel for SUNE's Audit Committee admitted in a letter to Mr. Perez's counsel on June 1, 2016,

> [I]t is the Audit Committee's view that **[Defendant Truong's] December 4, 2015 letter contains mistakes and/or potential for misperception**.  To make sure the record is clear, … please note that **the liquidity review and findings described in [Truong's] December 4, 2015 letter were … the work of management not**

**the Audit Committee nor KPMG, and <u>KPMG was not informed of the correspondence on behalf of your clients or any allegations of your clients at the time</u>**.[2]

12.     On January 14, 2016, even though Mr. Perez had repeatedly advised the Company that he did not intend to resign, the Companies purported to "accept" his "voluntary" resignation and falsely represented to him yet again in writing that SUNE's Board had completed its investigation and found no wrongdoing.  In a letter to Mr. Perez dated that day, SUNE's Human Resources Director, Stephen Cerrone – at the direction of Defendants Chatila and Hernandez – asserted that Mr. Perez's supposed "resignation" was prompted by Plaintiff's "disagreement with the **conclusions** of the Board's investigation."  In fact – as SUNE ultimately admitted in a filing with the U.S. Securities and Exchange Commission (the "SEC") – the supposed "investigation" was not remotely close to completion as of January 14, 2016, and, according to SUNE's own SEC filings, remained "**still underway**" for months thereafter.

13.     On January 20, 2016, Mr. Perez again notified the Companies in writing that he had not, in fact, resigned, and remained willing to continue to work as COO of each of the Companies upon satisfaction of the conditions described above.  In that letter, Mr. Perez also reiterated that, barring internal changes, the Companies' actions prevented him from serving as a senior executive and materially diminished his duties and responsibilities.

14.     In late February and March of 2016, Defendants' unlawful scheme began to unravel in public.  SUNE announced on February 29, 2016, that it was "unable to timely file its Annual Report on Form 10-K for the fiscal year," and that its independent counsel, "with the assistance of accounting and financial advisors," had advised the company to assess seriously the allegations of "a current and a former employee of the Company" regarding its financial statements.  SUNE acknowledged in the same SEC filing that SUNE may have to "*reassess the*

---

[2]  Except where otherwise indicated, bolding and underlining has been added in quotations of documents.

*Company's liquidity position as well as the disclosures in the Form 10-K, including whether the Company may require greater liquidity than previously anticipated and/or whether the sources are sufficient to meet its requirements.*"  Later in March 2016, SUNE announced that it remained unable to complete its Annual Report on Form 10-K because of "*material weaknesses in its internal controls over financial reporting*[.]"  SUNE also announced on the same day that, in addition to being under investigation by the SEC, it had received a subpoena from the U.S. Department of Justice seeking information and documents relating to, among other topics, intercompany transactions between SUNE and each of GLBL and TERP and certain investigations by SUNE's audit committee.

15.     On April 21, 2016 – without having fulfilled its obligations under the improperly approved self-dealing transaction with GLBL – SUNE filed for Chapter 11 bankruptcy protection.

16.     In view of the retaliatory action taken against Messrs. Domenech and Alejandro Hernandez, and Defendant Chatila's threats that the Companies would deny Mr. Perez duly-owed compensation and rights if he did not accede to their demands regarding employment at a reduced position until mid-2016, the adverse action taken against Mr. Perez – including, among other actions, discontinuation of his salary, bonus and benefits and denial of his right to automatic vesting of shares in GLBL and TERP – was clearly intended to silence him from raising concerns about the Defendants' non-compliance with the federal securities laws and other misconduct detrimental to the Companies' public shareholders and creditors.

17.     To date, despite due demand and public validation of the concerns Mr. Perez raised to all of the Defendants about SUNE's financial reporting and the ongoing misconduct of Defendants Chatila and Wuebbels, Defendants have failed and refused to accept responsibility

for their unlawful, retaliatory discharge of Mr. Perez and compensate him fully for the severe

financial harm and emotional distress he has suffered at their hands.  As a result, Mr. Perez has

suffered, among other injuries, loss of wages, benefits, bonuses, breaches of contractual rights,

and other money, benefits, stock and rights that he would have received but for Defendants'

unlawful retaliation.

## THE PARTIES

18.     Plaintiff Francisco J. Perez Gundin is the former COO of each of GLBL and

TERP, and a former member of both the GLBL and TERP Boards.  He is also a former EVP and

COO of SUNE.  Mr. Perez resides in Bethesda, Maryland.

19.     Defendant GLBL is a Delaware corporation that maintains its principal place of

business at 7550 Wisconsin Avenue, 9th Floor, Bethesda, Maryland 20814.  GLBL is a controlled

subsidiary of SUNE.  SUNE owns approximately 36% of GLBL's outstanding shares of stock

and controls approximately 98% of GLBL's voting power.  The remaining 64% of GLBL's

outstanding shares of stock is largely owned by public shareholders and traded on NASDAQ.

GLBL has not filed for bankruptcy.

20.     Defendant TERP is also a Delaware corporation that maintains its principal place

of business at 7550 Wisconsin Avenue, 9th Floor, Bethesda, Maryland 20814.  Like GLBL,

TERP is a controlled subsidiary of SUNE.  SUNE owns 43% of the total outstanding shares of

TERP and controls approximately 88% of TERP's voting power.  The remaining 57% of TERP's

outstanding shares of stock is largely owned by public shareholders and traded on the New York

Stock Exchange.  TERP has not filed for bankruptcy.

21.     At all relevant times until June 22, 2016, Defendant Ahmad Chatila was the

President and CEO of SUNE and a member of SUNE's Board of Directors.  And at all relevant

times until November 20, 2015, Chatila was the Chairman of both GLBL's Board of Directors

and TERP's Board of Directors.  Although Chatila resigned as the Chairman of GLBL's Board

of Directors and TERP's Board of Directors on November 20, 2015, he remained a member of

both the GLBL and TERP Boards at all times until his resignation on May 26, 2016.

22.     Defendant Brian Wuebbels is a former Executive Vice President and Chief

Financial Officer ("CFO") of SUNE.  He held those positions at all relevant times until his

termination effective June 9, 2016.  Wuebbels was also a Director of GLBL and TERP at all

relevant times until his resignation on March 30, 2016, and served as the President and CEO of

both GLBL and TERP from November 20, 2015, until March 30, 2016.

23.     Defendant Martin Truong has at all relevant times been the Senior Vice President,

General Counsel, and Secretary of SUNE.  He was also a member of the Board of Directors of

GLBL and TERP at all relevant times until his resignation on August 30, 2016.

24.     Defendant Emmanuel Hernandez has served at all relevant times as Chairman of

the Board of Directors of SUNE.  And at all times since November 20, 2015, he has held the

position of Executive Chairman of SUNE.

25.     Defendant Peter Blackmore was a member of the Board of Directors of SUNE for

nine years from 2006 until November 20, 2015.  On that day, he resigned from the SUNE Board

and was immediately installed at SUNE's direction as the Chairman of the Board of Directors of

both Defendant GLBL and TERP.  Defendant Blackmore has remained Chairman of both the

GLBL and TERP Boards, and the Conflicts Committee of both Boards, at all times since then.

In addition, since March 30, 2016, Defendant Blackmore has served as Interim CEO of both

GLBL and TERP.

26.     Non-Defendant SUNE is a Delaware corporation with operational headquarters in

Belmont, California.  SUNE filed for Chapter 11 bankruptcy protection on April 21, 2016.

### JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this complaint pursuant to

28 U.S.C. § 1331 because this is an action arising under the laws of the United States, namely the

Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203 ("Dodd-

Frank").

28.     This Court has personal jurisdiction over Defendants GLBL and TERP pursuant

to MD. CODE ANN., CTS. & JUD. PROC. § 6-102(a) because GLBL and TERP maintain their

respective headquarters in the State of Maryland.

29.     This Court has personal jurisdiction over Defendant Chatila under MD. CODE

ANN., CTS. & JUD. PROC. § 6-103(b) because at all relevant times, in connection with his duties

as a director of GLBL and director of TERP (and also Chairman of both companies' Boards for

much of the relevant time period), Chatila had regular contacts with this jurisdiction, both

physically and otherwise, and the claims herein arise out of such contacts.  For example, without

limitation, Chatila had daily electronic and telephonic communication with TERP and GLBL

employees in Maryland and – on at least a monthly basis – came to Maryland to conduct GLBL

and TERP business.  Chatila also regularly attended GLBL and TERP quarterly Board meetings

at those companies' headquarters in Bethesda, Maryland.

30.     This Court has personal jurisdiction over Defendants Wuebbels and Blackmore

under MD. CODE ANN., CTS. & JUD. PROC. § 6-103(b) because they each have served during the

relevant time period as CEO and a member of the Board of Directors of both GLBL and TERP;

have had regular contacts with this jurisdiction, both physically and otherwise, in those

capacities; and the claims herein arise out of such contacts.  For example, without limitation, at

all relevant times until March 30, 2016, Defendant Wuebbels had daily electronic and telephonic communication with TERP and GLBL employees in Maryland and – on at least a monthly basis – came to Maryland to conduct GLBL and TERP business.  Wuebbels also regularly attended GLBL and TERP quarterly Board meetings at those companies' headquarters in Bethesda, Maryland.  Similarly, without limitation, at all relevant times since November 20, 2016, Defendant Blackmore has had daily electronic and telephonic communication with TERP and GLBL employees in Maryland and – on almost a weekly basis – has come to Maryland to conduct GLBL and TERP business.  Defendant Blackmore has also regularly attended GLBL and TERP quarterly Board meetings at those companies' headquarters in Bethesda, Maryland.

31.    This Court has personal jurisdiction over Defendant Truong under MD. CODE ANN., CTS. & JUD. PROC. § 6-103(b) because, as a member of the Board of Directors of GLBL and TERP during the relevant time period, as well as in his capacities as Senior Vice President and General Counsel of SUNE, Defendant Truong had regular contacts with this jurisdiction, both physically and otherwise, and the claims herein arise out of such contacts.  For example, he had daily electronic and telephonic communication with TERP and GLBL employees in Maryland and – on at least a bi-monthly basis – came to Maryland to conduct business with or on behalf of GLBL and TERP.  In addition, Defendant Truong has regularly attended GLBL and TERP quarterly Board meetings at those companies' headquarters in Bethesda, Maryland.

32.    This Court has personal jurisdiction over Defendant Hernandez under MD. CODE ANN., CTS. & JUD. PROC. § 6-103(b) because at all relevant times he had regular contacts with this jurisdiction, both physically and otherwise, and the claims herein arise out of such contacts. For example, he has had more than weekly electronic and telephonic communication with TERP and GLBL employees in Maryland in his capacity as Chairman of the Board of Directors of

SUNE, which controls both GLBL and TERP and employed Mr. Perez in Maryland.  In addition,

Defendant Hernandez has visited GLBL and TERP's respective Maryland headquarters in

connection with business dealings between SUNE and GLBL and/or TERP, including, without

limitation, with respect to oversight of the Companies' employees who serve in senior executive

positions.

33.     Venue in this District and in this Division is appropriate pursuant to 28 U.S.C. §

1332 because the acts and harms that form the basis for this Complaint occurred in this District

and this Division.

## FACTS COMMON TO ALL COUNTS

*Relationship Between and Among the Companies*

34.     Before 2013, SUNE manufactured semiconductors, with particular expertise in

providing products for solar energy producers.

35.     SUNE then transformed into a worldwide developer of renewable energy

products, power plants and services.  Its business model was to use short-term financing to

develop renewable energy power plants and then sell them.

36.     Like a number of other energy project developers, SUNE sponsored "yieldcos."

A yieldco typically purchases completed or substantially-completed energy power plants from a

sponsor, and then operates them to produce cash dividends for the yieldco's investors.

37.     SUNE sponsored its first yieldco, Defendant TERP, in early 2014.  TERP

purchases and operates renewable energy projects in the developed world, specifically with

facilities in North America, Chile and the United Kingdom.  TERP completed its initial public

stock offering ("IPO") on July 18, 2014.

38.     In late 2014, SUNE sponsored a second yieldco, Defendant GLBL, which purchases and operates renewable energy projects in emerging markets.  GLBL completed its IPO on July 31, 2015.

39.     As discussed above, at all relevant times SUNE has maintained significant equity stakes in GLBL and TERP, and held voting control over both subsidiaries.

40.     GLBL and TERP each have a Management Services Agreement with SUNE pursuant to which SUNE provides management and administrative services to the two yieldcos. And, pursuant to other, related agreements, SUNE provided GLBL and TERP with "call rights" to acquire qualified and specified projects that SUNE developed on its own or acquired from other entities.

***Stock Grant to Induce Mr. Perez***
***to Accept Employment as COO of TERP***

41.     In late 2013, Defendant Chatila asked Mr. Perez to accept employment as COO of the first yieldco SUNE intended to launch, ultimately known as TERP.

42.     In order to induce Mr. Perez to accept that position, Defendant Chatila offered Mr. Perez, among other consideration, a grant of TERP shares through that company's Long-Term Incentive Plan.

43.     TERP and Mr. Perez memorialized the terms and conditions of that grant of shares in a written "Restricted Stock Agreement" dated January 31, 2014 (the "TERP Stock Agreement").  Under the TERP Stock Agreement, Mr. Perez's TERP shares were to vest over three years, with any unvested shares being subject to forfeiture under certain conditions.  More specifically, unvested shares were to be forfeited if Mr. Perez ceased to be employed by TERP,

SUNE, or any of their affiliates unless he was terminated by the Companies "without Cause."[3]  If Mr. Perez's employment with TERP, SUNE and all of their affiliates was terminated by the Companies "without Cause," 50% of any unvested shares would immediately vest.

44.     Upon becoming COO of TERP, and at all times during which he held that position, Mr. Perez worked as an employee of TERP.  He ran TERP's day-to-day business operations; reported *every day* for work at TERP's headquarters in Bethesda, Maryland, unless he was traveling on business; traveled extensively on TERP-related business; had a TERP business card; and reported directly to – and was directed in all of his TERP-related business activities by – TERP's CEO, Mr. Domenech.[4]

45.     The TERP IPO proved to be a tremendous success and was more than 20 times oversubscribed.  Under the leadership of Messrs. Domenech and Perez, TERP showed immediate operational success as well, outperforming all of its material pre-IPO projections.  For example, from its IPO on July 18, 2014, to September 30, 2015, TERP increased its

- annualized EBITDA from $193 million to $355 million;[5]

- annualized cash available for distribution from $107 million to $225 million; and

- dividends per share from $.90 to $1.40.

---

[3]  Under the TERP Stock Agreement, "Cause" is defined to include, *inter alia*, failure by Mr. Perez to make good-faith efforts to substantially perform his duties at TERP; dishonesty, willful misconduct or gross negligence in the performance of those duties; material breach of any written agreements with or policies of TERP; and certain types of criminal conduct.  Mr. Perez's stock agreements with GLBL, which are discussed below, define "Cause" in similar terms with respect to GLBL's rights and interests.

[4]  From the start of his employment at TERP until May 2015, Mr. Perez had no role or duties at SUNE.  He worked full-time as COO of TERP and, eventually, as COO of GLBL as well.  In May of 2015, he was appointed the COO of SUNE, while also retaining his employment as COO of GLBL and TERP.

[5]  "EBITDA" is an acronym for "earnings before interest, taxes, depreciation and amortization."  EBITDA is used often in company valuations "because it is a good proxy for operating cash flow.  It provides the operating cash a business could generate if net working capital is maintained from year to year." *See* https://www.divestopedia.com/definition/722/earnings-before-interest-taxes-depreciation-and-amortization-ebitda.

16

***Stock Grant to Induce Mr. Perez***
***to Accept Employment as COO of GLBL***

46.     Given the success of its first yieldco, SUNE proceeded with plans to launch a

second yieldco, ultimately known as GLBL.  As discussed above, GLBL was formed for the

stated purpose of acquiring and operating renewable energy power plants in developing-world

countries, a market not served by TERP.

47.     In late 2014, SUNE decided that GLBL would be best served, and most favorably

received in its IPO, if it were led by the same proven senior-executive team that had successfully

launched TERP.  Accordingly, Defendant Chatila and Mr. Domenech asked Mr. Perez to take on

the additional role of COO of GLBL.

48.     In order to incentivize Mr. Perez to accept the additional employment role of

COO of a second start-up company, Mr. Domenech – on behalf of GLBL and its Board – offered

Mr. Perez a grant of shares in GLBL through that entity's Long-Term Incentive Plan.  The terms

of the GLBL stock grant to Mr. Perez are set forth in a written Restricted Stock Agreement dated

March 31, 2015 (the "GLBL Stock Agreement").

49.     The GLBL Stock Agreement provided that the shares granted thereunder would

vest in tranches annually over a four-year period.  Unlike the TERP Stock Agreement, the GLBL

Stock Agreement did not contain vesting acceleration language providing that 50% of any

unvested shares would immediately vest if Mr. Perez's employment with the Companies and any

other SUNE affiliates were to be terminated without "Cause."  The GLBL Stock Agreement did,

however, expressly state that the Committee overseeing GLBL's Long-Term Incentive Plan (*i.e.,*

the GLBL Board or its designee) had authority in its "sole discretion … to accelerate[] vesting of

the [GLBL shares] at any time and for any reason."

17

50.     In connection with the execution of the GLBL Stock Agreement, and on several occasions thereafter, Mr. Perez expressed concern to Mr. Domenech about the absence therein of an automatic, accelerated-vesting provision in the event of termination without "Cause."  Both before and after the parties executed the GLBL Stock Agreement, Mr. Domenech had in turn asked Defendant Chatila on behalf of Mr. Perez to grant acceleration.  Defendant Chatila advised Mr. Domenech that GLBL's Board – which Chatila chaired – could unilaterally accelerate vesting at any time for any reason.  And in each of those conversations, Defendant Chatila – speaking on behalf of GLBL and its Board – repeatedly directed Mr. Domenech to assure Mr. Perez that GLBL's Board would accelerate the vesting of half of Mr. Perez's unvested GLBL shares if his employment with the Companies and any affiliates were terminated without Cause. Defendant Chatila also told Mr. Domenech to assure Mr. Perez that the GLBL Board would immediately do so for Mr. Perez if there were ever any indication that Mr. Perez *might* be terminated without Cause.  As directed, Mr. Domenech passed each of those assurances on to Mr. Perez.

51.     In detrimental and reasonable reliance on GLBL's repeated promises, representations, and assurances, Mr. Perez executed the GLBL Stock Agreement and continued to work thereafter on a daily basis in his employment as COO of GLBL.

52.     Upon becoming COO of GLBL, and at all times during which he held that position, Mr. Perez worked as an employee of GLBL.  He ran GLBL's day-to-day business operations; reported *every day* for work at GLBL's headquarters in Bethesda, Maryland, unless he was traveling on business; traveled extensively on GLBL-related business; had a GLBL business card; and reported directly to – and was directed in all of his GLBL-related business activities by – GLBL's CEO, Mr. Domenech.

***SUNE's Unreliable Financial***
***Disclosures and Liquidity Crisis***

53.    On August 27, 2015, at SUNE's Mid-Quarter Board of Directors Meeting, SUNE

management – led by its CEO and CFO, Defendants Chatila and Wuebbels – reported to SUNE's

Board that the company would have a cash-burn rate (*i.e.*, a net reduction in cash on hand) of

$425 million in the 4th quarter ("Q4") of 2015 and a further net cash reduction of $32 million in

Q1 of 2016.

54.    Six days after that meeting, on September 2, 2015, Defendant Chatila stated

during a Bloomberg Financial interview that SUNE would generate *positive* cash flow in late

2015 or early 2016.  Chatila's public statement was contrary to the projection he presented to the

SUNE Board of Directors less than a week earlier.

55.    In mid-September 2015, Mr. Perez raised concerns to Defendant Chatila about the

coherence and transparency of presentations that had been recently made by Chatila and

Wuebbels about SUNE's actual and prospective cash holdings and liquidity and the capability of

Mr. Wuebbels to perform his duties as CFO of SUNE.  Mr. Perez offered his help and suggested

the formation of a broader group, including Mr. Domenech, among others, to help provide a

better understanding of SUNE's cash position.

56.    In response to the concerns raised by Mr. Perez and others, Defendant Chatila

agreed to form a working group tasked with examining the "end-to-end cash cycle" of SUNE in

order to assess SUNE's cash position and financing needs (the "Working Group").  Chatila

appointed Mr. Domenech and Defendant Wuebbels to co-lead the Working Group.

57.    In reviewing SUNE's cash position, the Working Group classified SUNE's cash

into two basic categories – (i) cash that was restricted or unavailable because it was already

legally committed to projects or other purposes; and (ii) unrestricted cash that is immediately available to satisfy any business need.

58.     On October 5, 2015, Mr. Domenech, on behalf of the Working Group, explained to Defendant Chatila the need for a framework to differentiate between restricted and unrestricted cash.  Mr. Domenech also informed Chatila that based on the best information available to the Working Group, SUNE's then-current *unrestricted* cash figure appeared to be **$342 million.**  In presenting that figure, Mr. Domenech cautioned that it was necessarily an approximation because the Working Group – which was supposedly being co-led by SUNE's CFO, Defendant Wuebbels – was having considerable difficulty obtaining current information from SUNE's finance department.

59.     During an October 7, 2015, business-update webcast open to the public, Defendant Chatila stated that SUNE "remains well capitalized with adequate liquidity."  In the same webcast, Defendant Wuebbels said that "excluding the cash from TerraForm [Power] and Global, the cash available at the standalone devco [*i.e.*, SUNE alone] was standing at approximately **$1.4 billion** at the end of the [3rd] quarter (September 30, 2016), up from $900 million at the end of the 2nd quarter."  And in a PowerPoint presentation given during the webcast, Chatila and Wuebbels respectively described SUNE's liquidity position as "robust" and "strong."  The PowerPoint presentation noted that the $1.4 million "available cash" figure "[i]ncludes cash committed for construction[,]" but did not reveal the amount of *unrestricted* cash SUNE had on hand at the end of Q3.

60.     The next day, October 8, 2016, Messrs. Perez and Domenech convened a conference call with two SUNE Board members and demanded that the Board retain independent accounting and financial advisors to investigate the company's liquidity position and the

accuracy of its financial reporting on that issue.  The participants in the call from SUNE's Board were Defendant Hernandez, the Chair of SUNE's Board, and Steven Tesoriere, the Chair of the Finance and Investment Committee of SUNE's Board and a director of GLBL and TERP. Messrs. Domenech and Perez told the two SUNE directors about the efforts and concerns of the Working Group; expressed concerns about the lack of transparency into SUNE's cash position and the basis for its projections; identified certain inconsistencies between the internal and public statements Defendants Chatila and Wuebbels had made about SUNE's cash position; and explained the reasons they believed that SUNE's unrestricted cash appeared to be substantially below the publicly-reported "available cash" figure of $1.4 billion.

61.     Despite the concerns and warnings of Messrs. Domenech and Perez, SUNE's Board did not hire independent financial and accounting advisors to analyze SUNE's liquidity position.  Instead, Defendant Hernandez merely directed Defendants Chatila and Wuebbels to give a "presentation" about SUNE's liquidity position to the Board on October 23, 2015. Notably, Defendant Hernandez is a longtime mentor to, colleague and friend of, Defendant Chatila's.  Before joining SUNE and/or its Board, Hernandez and Chatila worked together for more than 10 years as senior executives at Cypress Semiconductors.

62.     Over the next two weeks, in multiple phone calls with Defendant Hernandez, Mr. Perez reiterated his concerns about SUNE's liquidity position and his recommendation that SUNE's Board retain outside, independent financial advisors to examine SUNE's actual cash position and the reliability of the representations being made by Defendants Chatila and Wuebbels in that regard.

63.     On each occasion, Defendant Hernandez "thanked" Mr. Perez for raising his concerns to the Board and assured him that SUNE's Board was taking those concerns very

seriously and attending to the situation.  Defendant Hernandez also stated that he was working closely with Defendant Blackmore, who was the Chair of the SUNE Board's Corporate Governance Committee at the time, in assessing and responding to the concerns regarding SUNE's cash position.  During those calls, Defendant Hernandez repeatedly referred to Defendant Blackmore as his "sounding board."  Hernandez also emphasized that the SUNE Board had to go through a "process" given the serious nature of the concerns raised and told Mr. Perez that until the Board had completed its process, Hernandez needed to rely on his "trust me card" with Mr. Perez.

64.     Also in mid-October of 2015, amidst their efforts to prepare a presentation to SUNE's Board on SUNE's liquidity position, Defendants Chatila and Wuebbels proposed a transaction between SUNE and GLBL that – tellingly – would have provided SUNE with an immediate cash infusion from its subsidiary.  More specifically, Chatila and Wuebbels proposed that a subsidiary of GLBL purchase from another subsidiary of SUNE certain solar projects that were in the early stages of development in India for $49 million (the "Proposed India Solar Transaction").

65.     Mr. Perez advised his direct superior at GLBL, Mr. Domenech, that Mr. Perez did not think the Proposed India Solar Transaction was advisable for GLBL.  Mr. Perez advised Mr. Domenech that, given the concerns about SUNE's liquidity position and its apparent inability to provide collateral or other security for the pre-payments, GLBL should not pre-pay SUNE for projects still in the early stages of development.

66.     On October 19, 2015, Mr. Perez attended a "Quarterly Business Review" (the "QBR"), at which Defendants Chatila and Wuebbels presented certain preliminary financial results and forecasts to senior management of the Companies.  During that meeting, Chatila and

22

Wuebbels projected that SUNE would have a cash-burn rate of $801 million in Q4 of 2015 and $521 million in Q1 of 2016.  Defendants Chatila and Wuebbels also provided a six-quarter forecast showing a cumulative cash-burn rate of $1.075 billion.

67.     Shortly before, and immediately after the October 19, 2015, QBR, Defendant Chatila met individually with senior executives and managers in charge of the Companies' operating units in an effort to coerce them into changing revenue and expense forecasts for the respective business units so that Chatila could reduce SUNE's projected cash-burn rate. Defendant Chatila conducted one such meeting with Mr. Perez.  Mr. Perez responded to Chatila's request by stating that Mr. Perez had no realistic, factual basis for lowering the projected cash-burn rate of any SUNE units into which Mr. Perez had visibility.  Mr. Perez also expressed the view that, rather than attempting to alter forecasts, Chatila and SUNE should take meaningful action to address SUNE's liquidity situation.  Defendant Chatila immediately became agitated, berated Mr. Perez in a profanity-laced tirade, and told him that his job was to follow Chatila's directions.  Mr. Perez responded by stating that Chatila could choose to fire him if he wanted, but Mr. Perez could not in good conscience misrepresent facts to SUNE's Board.

68.     On October 21, 2015 – two days before Defendants Chatila and Wuebbels were supposed to give the presentation to the SUNE Board about SUNE's cash position and projections – Chatila advised the SUNE Board that he and Wuebbels needed to postpone the presentation.  Defendant Hernandez agreed to have the presentation given at a previously-scheduled meeting of SUNE's Board on October 26, 2015.

69.     On October 26, 2015, SUNE's Board met as previously scheduled at the company's headquarters in Belmont, California.  Although Mr. Perez was initially invited to

attend the meeting in person by Defendant Hernandez, Hernandez rescinded the invitation at the last minute.

70.     Mr. Perez, along with three other senior executives of the Companies who were also extremely concerned about SUNE's liquidity and the reliability of its cash forecasts, nevertheless flew to California to be available in person to SUNE's Board during or after the meeting.  Mr. Perez was joined on the trip by Mr. Domenech, Paul Gaynor, another EVP of SUNE who was in charge of its utility operations, and Alejandro Hernandez, the CFO of GLBL and TERP.  Messrs. Perez, Domenech, Gaynor, and Alejandro Hernandez advised SUNE's Board in advance of the meeting that they were available to participate in person in any or all portions of the Board meeting.  After they had reiterated their request to participate in person several times, the SUNE Board conceded to have Mr. Perez and the other senior executives participate in the SUNE Board meeting *by telephone* – despite the fact that they were in a hotel next to SUNE's headquarters – for a portion of the financial presentation relating to SUNE's cash position and forecast.

71.     During the meeting, Defendants Chatila and Wuebbels presented a cash forecast that was starkly at odds with the forecast they had given a week earlier at the QBR.  Chatila and Wuebbels told the Board they projected that SUNE would burn $256 million in Q4, $394 million in Q1 of 2016, and a cumulative, net total of $643 million over the next six quarters.  The differences between the projections offered by Chatila and Wuebbels at the SUNE Board meeting and the QBR just a week earlier were as follows:

| Quarter(s) | QBR Burn-Rate Forecast | 10/26 SUNE Board Mtg. Burn-Rate Forecast | % Reduction from QBR to Bd. Mtg. |
|---|---|---|---|
| Q4 2015 | $801 Million | $256 Million | 68% |
| Q1 2016 | $521 Million | $394 Million | 24% |
| Q4 2016 – Q1 2018 | $1.075 Billion | $643 Million | 40% |

72.     After the presentation by Defendants Chatila and Wuebbels, with the SUNE Board still in session, Defendant Blackmore asked Mr. Perez and the other senior executives on the line if they wished to comment on the liquidity forecast.

73.     Mr. Perez went first, and advised Defendant Blackmore and the rest of the SUNE Board that he "completely disagreed" with the financial forecast presented to the Board by Defendants Chatila and Wuebbels.  Mr. Perez pointed out that the forecast that had just been presented to the SUNE Board depicted a far more positive outlook than Defendants Chatila and Wuebbels had presented just a week earlier in the QBR, and appeared to be based on a variety of unrealistic and problematic assumptions.  Mr. Perez also expressed concern over SUNE's ability to navigate over the next two quarters given that the company appeared to have less than $90 million of unrestricted cash on hand, close to $3 billion in projects under construction, and over 2,700 employees on payroll.  Moreover, Mr. Perez reported that in 2015 the Materials Division of SUNE appeared to have a cash-burn rate of $500 million and the Residential Division appeared to have a cash-burn rate of $200 million.  Mr. Perez then stated that he was alarmed by SUNE's failure to investigate these financial losses and the apparent lack of reliability of SUNE's internal and external cash reporting and forecasting.  He also suggested that SUNE appeared to need a significant cash infusion to address its liquidity needs and expressed concern, more generally, about SUNE's complete lack of transparency regarding its financial information.

74.     Next, Defendant Blackmore asked for Mr. Domenech's feedback.  Mr. Domenech stated that the assumptions in the cash forecast were insufficiently clear and transparent, appeared to be unreliable and unduly optimistic, and improperly included $49 million in Q4 of 2015 from the Proposed India Solar Transaction that was ill-suited for GLBL and had not received the necessary approval of the GLBL Conflicts Committee.  Mr. Domenech also recommended that SUNE seek a substantial outside investment from a strategic partner or investor to fortify SUNE's liquidity position.

75.     Defendant Blackmore then asked Mr. Gaynor to comment.  Mr. Gaynor expressed severe concerns about the continuing lack of transparency into the basis for the cash figures and projections provided by Chatila and Wuebbels.  Mr. Gaynor also stated that the cash position statements and projections Defendants Chatila and Wuebbels had made regarding SUNE divisions under Mr. Gaynor's direct control did not appear to be reliable.

76.     Finally, Alejandro Hernandez – the CFO of GLBL and TERP – expressed concern about the lack of visibility he had into the financial affairs of SUNE and the reliability of its liquidity reporting and projections.  Alejandro Hernandez also stated that he could not understand SUNE's apparent cash predicament given that it had just raised $650 million of cash in August of 2015 through a convertible preferred stock offering.

77.     Immediately after the SUNE Board meeting, Defendant Blackmore called Mr. Perez to speak with him individually.  Defendant Blackmore told Mr. Perez that Blackmore had been kept apprised by Defendant Hernandez of the concerns Mr. Perez and other executives had raised about the reliability of SUNE's statements and forecasts regarding its cash position, and that SUNE's Board was looking into the situation.  Defendant Blackmore then asked Mr. Perez to "support" Defendant Chatila and "trust" SUNE's Board.  Mr. Perez responded that, given his

26

continuing concerns about the reliability of Chatila and Wuebbels' public and internal

representations about SUNE's liquidity position and projections, he could no longer work

effectively with either of them.  Mr. Perez also stated that unless he was reliably assured that

SUNE was making accurate statements regarding its actual cash position and projections, he

would not be able to perform his duties as COO of each of the Companies.

78.     On November 9, 2015, SUNE represented in its 10-Q financial statement filed

with the SEC for Q3 of 2015 that as of September 30, 2015, SUNE "had access to $1.3 billion in

cash and cash equivalents, including cash committed to construction projects."  And in SUNE's

Q3 2015 Earnings Conference Call on November 10, 2015 – while reviewing a PowerPoint slide

that contained the statement "**Liquidity Bolstered During the Quarter**" – Defendant Wuebbels

stated that SUNE had "sufficient liquidity" of "**approximately $1.4 billion** at the end of the

quarter."

79.     The liquidity position represented in SUNE's 10-Q and in the November 10,

2015, conference call included as "cash and cash equivalents" funding provided through debt

facilities upon which SUNE did *not* have unrestricted ability to draw in the future.  Netting out

cash available through *restricted* debt facilities, SUNE's unrestricted cash balance as of

September 30, 2015 was, in fact, only approximately **$497 million.**

80.     And on November 10, 2015 – the day Defendant Wuebbels publicly stated that

SUNE had approximately $1.4 billion in cash – the unrestricted cash balance across SUNE and

all of its subsidiaries (other than GLBL and TERP) had dropped to approximately **$91 million**,

with **SUNE itself holding only $22 million**.

81.     On or after November 10, 2015, Defendant Chatila asked Mr. Perez to "find a

way" for GLBL and/or TERP to lend $100 million without the knowledge of the lending

company or companies' Conflicts Committee(s).  Defendant Chatila also requested that Mr.

Perez use his influence with GLBL and TERP's senior executive teams to persuade them to go

along with Chatila's plan.  Mr. Perez declined Chatila's request and promptly reported Chatila's

improper request to Messrs. Domenech, Alejandro Hernandez, the GLBL and TERP Conflicts

Committees, and the General Counsel of TERP.

82.     On November 18, 2015, the unrestricted cash balance across SUNE and its other

subsidiaries fell to **$74 million**.  Given the severity of SUNE's cash predicament, Mr. Perez

recommended to Chatila that day that SUNE evaluate the option of filing for bankruptcy

protection.  Defendant Chatila responded that he was giving serious consideration to having

SUNE do so.  Thus, merely nine days after he and Defendant Wuebbels had publicly represented

that SUNE had "sufficient liquidity," Defendant Chatila was discussing the need to declare

bankruptcy in order to address SUNE's liquidity crisis.

83.     Mr. Perez reiterated on November 19, 2015, to Defendant Chatila that SUNE

would be well advised to consider strongly the option of filing for bankruptcy.  Defendant

Chatila again indicated that he was seriously considering that option for SUNE.

84.     As of the morning of November 20, 2015, SUNE and its other subsidiaries'

unrestricted cash balance had dropped to approximately **$16 million**, with SUNE, excluding its

subsidiaries, having only approximately **$0.7 million** in unrestricted cash.

***SUNE Attempts to Coerce the Yieldcos***
***Into Transactions Against Their Best Interests***

85.     In an effort to address its liquidity crisis, SUNE brazenly attempted to force

transactions upon GLBL and TERP that were proposed neither in good faith nor with any regard

for the interests of GLBL and TERP's public shareholders.

86.     In addition to the Proposed India Solar Transaction involving GLBL discussed above, Defendants Chatila and Wuebbels advocated for another Proposed Self-Dealing Transaction related to the assets of Vivint Solar, Inc. ("Vivint").  On July 20, 2015, Defendant TERP had agreed to purchase from SUNE certain renewable power assets of Vivint as to which SUNE held acquisition rights (the "Vivint Drop-Down Agreement").  Under the Vivint Drop-Down Agreement, SUNE was to receive approximately $922 million in aggregate cash from TERP.

87.     All amendments to the Vivint Drop-Down Agreement required TERP's consent, which could only be granted by the TERP Conflicts Committee.  The TERP Conflicts Committee, at the time, consisted of only two directors – Hanif Dahya and Mark Lerdal – neither of whom held any positions with TERP's controlling parent, SUNE.

88.     On November 6, 2015, the TERP Conflicts Committee met to discuss certain proposed amendments to the Vivint Drop-Down Agreement.  The proposed amendments related to a reduction in the amount of energy generated from the assets TERP was to acquire, a change in the amount TERP was obligated to pay, and a revision giving SUNE flexibility to sell Vivint assets to third parties rather than only to TERP.  Defendant Wuebbels requested that the TERP Conflicts Committee approve all aspects of all amendments by the following business day, prior to SUNE's and TERP's Q3 earnings releases, despite the fact that the TERP Conflicts Committee had not seen *any* documentation relating to the proposed amendments.  The TERP Conflicts Committee declined to approve the amendments at that time, but advised Wuebbels that it would continue to evaluate them.

89.     Six days later, at a November 12, 2015, TERP Conflicts Committee meeting, Defendant Chatila demanded that the TERP Conflicts Committee approve the amendments to the

Vivint Drop-Down Agreement by the end of that day.  As Defendant Chatila well knew, SUNE had not yet provided requested financial information necessary for the Committee's advisors to complete their financial analysis and the TERP Conflicts Committee had only engaged legal and financial advisors the previous day.  Mr. Domenech and Mr. Perez attended this meeting.  Mr. Domenech voiced his concerns about certain material aspects of the Vivint Drop-Down Agreement, as well as the fact that the Committee had insufficient time to review the proposed amendments and consult with its independent legal and financial advisors.  TERP's Conflicts Committee did not approve the proposed amendments, but indicated to Chatila that it would continue to evaluate them.

90.     Shortly after that meeting, Defendant Chatila made a thinly-veiled threat to TERP Conflicts Committee member Hanif Dahya, telling Dahya that the Committee "was not moving fast enough" and that SUNE wanted "a more agile Committee."

91.     At a November 18, 2015, TERP Conflicts Committee meeting attended by Mr. Perez, the TERP Conflicts Committee discussed a request from SUNE in which TERP would repurchase $104 million of TERP shares from SUNE (the "Repurchase Proposal").  SUNE looked to TERP for emergency help after a decline in TERP's stock price had triggered a call of $100 million on a margin loan to SUNE secured by certain shares of TERP owned by SUNE. The TERP Conflicts Committee ultimately decided against the Repurchase Proposal.

92.     At that same November 18, 2015, meeting, Defendant Chatila suggested other ways for TERP to "support" SUNE amidst the liquidity crisis, including prepayment for assets and extending an unsecured loan to SUNE.  The TERP Conflicts Committee rejected those SUNE-favorable proposals due to SUNE's precarious financial position and the consequent risk the proposed transactions posed for TERP and its shareholders.

93.     On November 19, 2015, with Mr. Domenech in attendance, the TERP Conflicts

Committee declined to grant SUNE's request that TERP release restrictions on certain shares of

TERP owned by SUNE.  The TERP Conflicts Committee explained that in consideration for

releasing those restrictions, the Conflicts Committee wanted SUNE to convey something of

value in return to TERP, such as relinquishment of certain control rights over TERP.  Defendant

Chatila responded by stating to Mr. Perez that the Conflicts Committee's requirement of

consideration in return for the restriction release was an "**act of war**."

94.     Immediately after the meeting, Defendant Chatila scheduled a special meeting of

the TERP and GLBL Boards to take place on the following day.  Despite requests by Messrs.

Perez and Domenech for the Chairman of each Board to provide an agenda and materials in

advance of the meeting, Chatila – the Chairman of both Boards – refused to do so until minutes

before the meetings.

### The *"Friday Night Massacre"*

95.     On November 20, 2015, at meetings of the GLBL and TERP Boards, SUNE –

through the direct or indirect efforts of each of the Individual Defendants – acted with utter

disregard for the interests of GLBL and TERP's public shareholders to eliminate all governance

impediments to SUNE's ability to draw cash at will from the yieldcos.

96.     As an initial step, SUNE exercised its right as the majority owner of Class B

Common Stock of GLBL and TERP, respectively, to designate three new, SUNE-loyal members

to the GLBL and TERP Boards and Conflicts Committees.

97.     Defendant Chatila then resigned as Chairman of GLBL and TERP, but remained a

member of both Boards.

98.     Defendant Blackmore – Chatila and Hernandez's confidante who had been personally warned by Messrs. Perez, Domenech, Gaynor and Alejandro Hernandez about SUNE's liquidity problems and unreliable forecasts and had done absolutely nothing in response – "resigned" from SUNE's Board and was immediately installed by SUNE as the new Chairman of the Boards of GLBL and TERP.

99.     Because he was no longer a member of the SUNE Board as of November 20, 2015, Defendant Blackmore was now able to masquerade as an "independent" director of GLBL and TERP and serve on the Conflicts Committee that could approve transactions between those Companies and SUNE.  Despite his public claims to the contrary, Defendant Blackmore knew at all relevant times that all of the transactions SUNE sought to enter into with GLBL and TERP on and shortly after November 20, 2015, were designed to bail SUNE out of its liquidity crisis at the expense of GLBL and TERP and their public shareholders.

100.     After SUNE added the new SUNE-loyal members to the TERP and GLBL Boards, Messrs. Lerdal and Dahya were removed from the GLBL and TERP Conflicts Committees and replaced with SUNE loyalists, including Defendant Blackmore.  When asked directly by Mr. Lerdal why the Conflicts Committees' members were being replaced, Defendant Blackmore offered no explanation.

101.     The expanded GLBL and TERP Boards then terminated Alejandro Hernandez from his positions as CFO of TERP and GLBL.  As discussed above, Alejandro Hernandez – along with Messrs. Domenech, Perez, and Gaynor – had raised concerns to the SUNE, TERP and GLBL Boards regarding the transparency and accuracy of SUNE's internal and external representations as to its financial position.  Alejandro Hernandez was replaced shortly thereafter

by SUNE-insider Rebecca Cranna, who also served as CFO of Global Asset Management for SUNE.

102.     To further consolidate its control of GLBL and TERP, SUNE – acting through its hand-picked henchman, Defendant Blackmore, and its other loyalists on the GLBL and TERP Boards – then used its controlling power to terminate Mr. Domenech's employment as President and CEO of GLBL and TERP and to remove him from the GLBL and TERP Boards.  That same afternoon, SUNE's Human Resources Director, Stephen Cerrone, appeared unannounced at GLBL and TERP's offices and advised Mr. Domenech that he was being terminated "without cause" from all other positions with SUNE and any of its other affiliates.

103.     Mr. Domenech was immediately replaced on Friday, November 20, 2015, as President and CEO of GLBL and TERP by Defendant Wuebbels – SUNE's CFO who, along with Defendant Chatila, had been making false and misleading statements to the market about SUNE's liquidity position and internally advocating for self-dealing transactions that would benefit SUNE to the detriment of GLBL and TERP and their public shareholders.

104.     Defendant Blackmore – GLBL and TERP's newly installed Chairman and Conflicts Committee member – knew when he recommended and voted to install Defendant Wuebbels as President and CEO of GLBL and TERP that Wuebbels had publicly and privately misrepresented SUNE's liquidity position and forecasts and, like Blackmore, intended to use his positions within GLBL and TERP in an effort to rescue SUNE from its liquidity crisis without regard for the interests of GLBL and TERP's public shareholders.

105.     Immediately after the GLBL and TERP Board meetings concluded on November 20, 2015, two GLBL directors, Mark Florian and former GLBL and TERP Conflicts Committee member Mark Lerdal, resigned from their seats on the GLBL and TERP Boards.  Mr. Florian

and Mr. Lerdal each expressly advised the GLBL and TERP Boards in writing that day that he had resigned because, in the wake of the actions taken that day, he could no longer protect the interests of GLBL and TERP's public shareholders as a member of those Boards.

***Defendants Immediately***
***Approve Improper, Self-Dealing Transactions***

106.    Facing an acute liquidity crisis, but armed with complete control over GLBL and TERP through the firing of Mr. Domenech and related appointment of SUNE surrogate Blackmore as GLBL and TERP's supposedly "independent" Chairman and Conflicts Committee Chair, the Defendants began approving – within *minutes* of Blackmore's appointment – self-dealing transactions designed to divert hundreds of millions of dollars of cash from GLBL and TERP to SUNE in return for grossly inadequate consideration.

107.    For example, *within minutes* of purging Mr. Domenech and others, Defendant Blackmore led the re-constituted GLBL Conflicts Committee to push through a substantially expanded version of the India Solar Transaction that had previously been rejected as unfair to GLBL by Mr. Domenech and GLBL's prior Conflicts Committee.  Of the total consideration of $231 million paid by GLBL to SUNE in connection with that transaction, $150 million in cash was paid by wire that afternoon – on *November 20, 2015* – without any restriction requiring SUNE to use the cash for the development of the subject projects in India.  The newly-constituted Conflicts Committee did so despite the fact that it received no notice of the expanded India Solar Transaction and without making any effort whatsoever to obtain independent financial or legal advice or the input of Mr. Perez, GLBL's General Counsel, or any other senior executives of GLBL.  Notably, the only persons who advised the new GLBL Conflicts Committee regarding the India Solar Transaction on November 20, 2015, were Defendants Chatila, Wuebbels, and Truong – all of whom had conflicts of interest as officers and directors of

SUNE.  Indeed, Defendant Truong actually signed the governing Purchase and Sale Agreement

(the "PSA") for the transaction *on behalf of SUNE*.

108.    Based on the plain language of the PSA, his discussions with Messrs. Perez,

Domenech, Gaynor and Alejandro Hernandez, and other information readily available to him,

Defendant Blackmore knew at all relevant times that the expanded India Solar Transaction was

unfair to GLBL and its public shareholders.  For example, under the terms of the PSA, the funds

wired by GLBL to SUNE were "unrestricted" – meaning that SUNE had no obligation to apply

those funds to the construction of the projects in India that were the subject of the PSA.  Yet with

utter disregard for the interests of GLBL's public shareholders, he shepherded that transaction

through the newly-reconstituted GLBL Conflicts Committee.  Defendant Blackmore

recommended and obtained Conflicts Committee approval for a transaction that he knew to be

intentionally structured to pump cash into SUNE without adequate protection from, or

consideration for, the clear and present risk that SUNE would not be able to complete the project

– which is exactly what ultimately happened.

109.    As soon as GLBL wired the $150 million to SUNE in connection to the India

Solar Transaction, SUNE immediately wired $100 million to the lender of its margin loan.  After

making that emergency payment, SUNE's liquid cash fell to approximately **$50 million**.[6]

***Defendants Constructively Discharge Mr. Perez***

110.    On November 20, 2015, following SUNE's termination of Mr. Domenech and the

resignation of several TERP and GLBL Board members, Mr. Perez advised the Companies that

---

[6]  On December 1, 2015, SUNE and GLBL agreed to amend the India Solar Transaction such that the full $231 million was prepaid, again without any restriction on SUNE's use of the funds.  SUNE thus successfully extracted another $81 million in cash from GLBL for its own immediate benefit without providing any material consideration in return for that concession.  Notably, on the day Defendant Blackmore led the approval of the amended India Solar Transaction, SUNE's stock price had fallen to $3.49 per share, down 88% since July 20, 2015, and the prospect of SUNE declaring bankruptcy was clearly on the horizon. The Amendment was approved by the reconstituted GLBL Conflicts Committee and the entire GLBL Board at the recommendation of Defendant Blackmore, again without regard for the best interests of GLBL's public shareholders.

he was resigning effective immediately from the *Boards* of GLBL and TERP (not from his employment positions with the Companies).  Mr. Perez also spoke with Defendants Hernandez and Blackmore on November 20, 2015, and informed them that he could not support the actions taken by the GLBL and TERP Boards and did not see how he could fulfill his fiduciary responsibilities in the current environment.  Mr. Perez, however, did not resign his employment with any of the Companies, but rather requested that the Companies restore proper governance.

111.   Defendant Hernandez requested that Mr. Perez speak with Defendant Chatila on the following day, November 21, 2015.  Chatila told Mr. Perez that the Board of each of the Companies was aware of, and approved, all actions he had taken regarding the reporting of SUNE's financial position and all self-dealing transfers between the Companies.  Defendant Chatila then advised Mr. Perez that Chatila had agreed with SUNE's Board to resign from all of his positions with the Companies by May or June of 2016.  Chatila stated that he wanted Mr. Perez to remain with the Companies in a materially reduced role until that time, and that if Mr. Perez agreed to do so, the Companies would provide him with a "good deal" with respect to severance pay and benefits.  Chatila then threatened that if Mr. Perez did not accept the offer, Mr. Perez "would not get a penny" of his entitled rights because the Companies would take the position that he had voluntarily resigned.

112.   On Monday, November 23, 2015, Mr. Perez met with SUNE's Chief Human Resources Officer, Stephen Cerrone, to explain the reasons why he could not perform his duties in the absence of corrective action.  In response, Cerrone stated that Defendant Chatila had instructed him that if Mr. Perez did not return to work, the Companies would not provide Mr. Perez with any of the contractual and promised severance benefits and vesting of shares to which Mr. Perez was entitled upon his termination without Cause.

113.    The following day, November 24, 2015, Cerrone contacted Mr. Perez by email and requested that Plaintiff advise SUNE whether he intended to resign or return to work. Cerrone also asserted that if Mr. Perez failed to return to work by December 1, 2015, Mr. Perez would be "deemed to have voluntarily resigned."

114.    On December 1, 2015, counsel for Mr. Perez sent a letter to Defendant Hernandez and Cerrone reiterating that Mr. Perez's inability to perform his duties in the wake of the events of November 20, 2015, did not indicate that Mr. Perez had "voluntarily resigned" or had any plans to do so.  Additionally, Mr. Perez's counsel relayed Mr. Perez's significant concerns regarding SUNE's liquidity position and its problematic "solution" to those troubling financial issues and past misreporting, which involved superficial transactions that merely propped up SUNE by harming the interests of the public shareholders of GLBL and TERP.  Counsel for Mr. Perez also made clear that he was willing to return to work once proper and lawful governance had been restored and that, in the absence of such action, the Companies' conduct would constitute constructive termination without cause of Mr. Perez as an employee and functioning executive officer.

115.    The December 1, 2015, letter from Mr. Perez's counsel also reiterated Mr. Perez's continuing concerns about SUNE's non-compliance with its legal obligations under federal securities laws as well as SUNE's unwillingness to address its apparent violations.

116.    On December 4, 2015, Defendant Truong, the General Counsel and a director of each of the Companies, sent a letter to Mr. Perez's counsel riddled with false statements purposefully designed to create an inaccurate paper trail about the actions SUNE and the Defendants had supposedly taken in response to Mr. Perez's concerns.

117.    In that letter, Defendant Truong made, among other false assertions, the following statements:

> As Mr. Perez and Mr. Gaynor know, when these allegations were raised in or about October 2015 to the Chairman of [SUNE's] Board, the committee chairs were notified and management was requested to conduct a liquidity review.  **With the assistance of outside counsel and independent auditors (KPMG),** a detailed liquidity review was, in fact, conducted, and the allegations were found to be without merit.  The results of the liquidity review were shared with [SUNE's] full Board, its executive team, its independent auditor, its outside counsel, and with Mr. Perez and Mr. Gaynor, among others.  Carlos Domenech, Alex Hernandez, Mr. Perez and Mr. Gaynor were all participants at the October 23, 2015 meeting where the results were discussed.  Messrs. Domenech, [Alejandro] Hernandez, Perez and Gaynor were full and active participants in the meeting, who had an opportunity (and did in fact) address the full Board of Directors.  The liquidity analysis and work product was accepted.

118.    In fact, as Defendant Truong knew at all relevant times, the independent accounting firm, **KPMG, did not assist in any way whatsoever** with the "liquidity review" **presented to SUNE's Board in October of 2015.**  As outside counsel for SUNE's Audit Committee ultimately admitted in a June 1, 2016 letter to Mr. Perez's counsel:

> [I]t is the Audit Committee's view that **[Defendant Truong's] December 4, 2015 letter contains mistakes and/or potential for misperception**.  To make sure the record is clear, … please note that **the liquidity review and findings described in [Truong's] December 4, 2015 letter were … the work of management not the Audit Committee nor KPMG, and KPMG was not informed of the correspondence on behalf of your clients or any allegations of your clients at the time**.

119.    On January 6, 2016, Mr. Perez sent a letter to SUNE, which stated "[a]s I have expressed on several occasions, I continue to be uncomfortable with the inaccurate public disclosures" being made by SUNE regarding its significant liquidity issues, as well as the self-dealing transactions which he believed were improper for all companies involved.

120.    On January 14, 2016, Cerrone – as part of the Defendants' continuing effort to create a false paper trail – sent a letter to Mr. Perez in which the Companies purported to

"accept" Mr. Perez's "resignation" even though Mr. Perez had previously expressly stated that

he was not resigning.

121.    Consistent with Defendant Truong's knowingly false assertions a month earlier,

Cerrone represented in that letter that SUNE's Board had conducted and *completed* an

investigation into the concerns raised by Mr. Perez and others:

> Clearly what prompted your resignation was your disagreement with the
> **conclusions** of the Board's investigation.  Such disagreement, however, provides
> no basis, under law or your employment agreement, to permit you to resign and
> demand severance pay from [SUNE].  The investigation was conducted in good
> faith, and there has been no claim otherwise.

122.    Mr. Perez sent a responsive letter to Mr. Cerrone on January 20, 2016, reiterating

that Mr. Perez had not resigned and that he was willing to continue to work at the Companies,

but that the Companies still needed to fix the serious issues that he had raised numerous times

with each of the Companies' Boards and SUNE executives, including Defendants Chatila and

Wuebbels.  In the letter, Mr. Perez also noted that barring internal changes at each of the

Companies, the Companies' actions prevented him from serving effectively as a senior

executive, and materially diminished his duties and responsibilities.[7]

123.    In a filing with the SEC dated February 29, 2016, SUNE admitted that, contrary

to its representations to Mr. Perez, SUNE had not completed its investigation into the concerns

raised by Messrs. Perez, Domenech, Gaynor, and Alejandro Hernandez.  In that Form 12b-25

filing with the SEC, SUNE stated that "[SUNE's] Audit Committee … initiated an inquiry in late

2015 based on allegations made by former executives of the Company concerning the accuracy

of the Company's anticipated financial condition," that the "Audit Committee, with input from

the Board, has been working diligently with its advisor, since late 2015," and that "**this process**

---

[7] Notably, SUNE waited to "accept" and publicly disclose Mr. Perez's supposed "resignation," and that of Paul
Gaynor, until after SUNE completed its $725 million offering of Second Lien Secured Term Loans on January 11,
2016.

**is still underway**."  In other words, contrary to the Defendants' express representations to Mr.

Perez in connection with his retaliatory termination, the Companies had not, in fact, completed

any investigation into the misconduct that had rendered impossible Mr. Perez's continued good-

faith performance of his employment duties.

***SUNE Collapses/GLBL Files Lawsuit Against SUNE***

124.    On February 29, 2016, SUNE also announced that it was "unable to timely file its

Annual Report on Form 10-K for the fiscal year . . . ."  Within the filing, SUNE revealed that

SUNE's hired independent counsel, "with the assistance of accounting and financial advisors,"

advised SUNE to seriously assess the allegations of "a current and a former employee of the

Company" regarding SUNE's financial statements, and that SUNE may have to "reassess the

Company's liquidity position as well as the disclosures in the Form 10-K, including whether the

Company may require greater liquidity than previously anticipated and/or whether the sources

are sufficient to meet its requirements."

125.    On March 16, 2016, SUNE announced that it was unable to complete its Annual

Report on Form 10-K within the 15-day extension period permitted under SEC rules because of

"material weaknesses in its internal controls over financial reporting."  Notably, SUNE's press

release recognized that the February 29, 2016, investigation into the accuracy of the SUNE's

financial statements was *ongoing* and had not been finalized.

126.    On March 29, 2016, GLBL filed a Form 8-K with the SEC announcing that

GLBL anticipated that the filing of its Form 10-K would be delayed.  The Form 8-K revealed a

myriad problems associated with the incomplete projects that GLBL was supposed to receive as

consideration for the $231 million it pre-paid in the amended India Solar Transaction.  For

example, the Form 8-K stated:

There are currently material amounts of project costs and equity contributions that remain to be contributed by SUNE to the India Projects. If [SUNE] is unable to fund these amounts, some or all of the India Projects may not be completed or transferred to [GLBL] on time or at all, and as a result [GLBL] would have to seek to recover the applicable portion of the prepaid purchase price amount from [SUNE].

127.    Two days later, SUNE announced in a Form 8-K filed with the SEC on March 31, 2016, that, in addition to being under investigation by the SEC, SUNE had received a subpoena from the DOJ seeking information and documents relating to, among other topics, intercompany transactions between SUNE and each of GLBL and TERP and certain investigations by SUNE's audit committee.

128.    On April 4, 2016 – in a transparent attempt to cover up the improper role of Defendant Blackmore and other GLBL directors in approving the India Solar Transaction as SUNE was collapsing toward bankruptcy – GLBL's Conflicts Committee caused GLBL to sue SUNE, SUNE Holdings Corp., and Defendants Chatila, Wuebbels, and Truong in Delaware Chancery Court (the "GLBL-SUNE Lawsuit"). That action is captioned *TerraForm Global, Inc. v. SunEdison*, et al., C.A. No. 12159-VCL. The GLBL-SUNE Lawsuit alleges, among other things, that SUNE misappropriated $231 million in cash from GLBL through the India Solar Transaction by falsely representing to GLBL that the India projects were substantially completed and that the $231 million that GLBL wired to SUNE between November 20 and December 1, 2015, would be used to finish the India projects and deliver them to GLBL on time. As discussed, Defendant GLBL's material allegations in the GLBL-SUNE Lawsuit are false, and have been known at all relevant times to be false by GLBL's Executive Chairman, Defendant Blackmore. Indeed, as discussed above, one purpose for Blackmore resigning from SUNE's Board on November 20, 2015 – and then immediately becoming the Chairman of GLBL's Board and the Chairman of its Conflicts Committee – was so that Blackmore could ensure that GLBL

41

would immediately provide an *unrestricted* cash infusion to SUNE so that SUNE could pay debts unrelated to the India Solar Transaction that were already due and owing.

129.    As noted above, SUNE filed for Chapter 11 bankruptcy on April 21, 2016.

130.    On September 27, 2016, GLBL announced that it consented to the sale by SUNE to a third party, through the SUNE bankruptcy proceeding, of all of the projects for which GLBL pre-paid $231 million in connection with the amended India Solar Transaction.  According to the announcement, GLBL does not anticipate receiving more than $10 million in return for its consent and is relinquishing all claims against the third-party buyer to any rights in the projects.

## FIRST CAUSE OF ACTION

### RETALIATION IN VIOLATION OF 15 U.S.C. § 78u-6 (DODD-FRANK)
### (Against All Defendants)

131.    Mr. Perez repeats and re-alleges the preceding allegations as if fully set forth herein.

132.    Mr. Perez was a direct employee of SUNE and each of Defendants GLBL and TERP, as well as a joint employee of all three Companies.

133.    Mr. Perez made disclosures to the Boards of SUNE, GLBL and TERP that were required or protected under the Sarbanes-Oxley Act of 2002 (15 U.S.C. § 7201 et seq.), the Securities and Exchange Act of 1934, including and without limitation Section 10(b) of the Securities and Exchange Act of 1934 (15 U.S.C. § 78l) and Section 17(a) of the Securities Act of 1933 (15 U.S.C. § 77q), and other laws, rules, or regulations subject to the jurisdiction of the SEC.  More specifically, Plaintiff disclosed, among other misconduct, financial misreporting by Defendants Chatila and Wuebbels in public statements and filings.

134.    Mr. Perez had both a subjectively and objectively reasonable belief that the conduct being reported violated a covered law, rule, or regulation.

135.    All of the Defendants knew or suspected that Mr. Perez engaged in such protected activity.

136.    Each of the Companies constructively discharged Mr. Perez because of his protected activity, and did so at the behest of each of the Individual Defendants.

137.    The Companies' conduct amounts to a constructive discharge of Mr. Perez's employment because, among other reasons, they: (1) repeatedly ignored and failed to respond adequately to his expressions of concern and allegations of illegal, financial wrongdoing; (2) attempted to force him to be a part of their illegal acts by mandating that he report to the same individuals he reasonably believed perpetrated the wrongdoing, under threat of refusing to issue the him contractually owed monetary and stock payments; and (3) outrightly lied to him so as to create a false paper trail in how they responded to his protected disclosures of wrongdoing.

138.    As a proximate result of Defendants' actions against Mr. Perez, as alleged above, Mr. Perez has been harmed in that he suffered the loss of salary, benefits, bonuses, vesting of stock grants, and other money that he would have received if he had not been subjected to the retaliatory treatment.  As a result of such conduct, Mr. Perez has suffered damages in an amount according to proof.

## SECOND CAUSE OF ACTION

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against GLBL)

139.    Mr. Perez repeats and re-alleges the preceding allegations as if fully set forth herein.

140.    Mr. Perez and GLBL are parties to the GLBL Stock Agreement.  Every contract imposes the duty of good faith and fair dealing upon the parties in performance and enforcement of the contract.

141.    Mr. Perez performed all, or substantially all, of the significant actions that the contract required him to perform.

142.    Defendant GLBL acted in bad faith and unfairly interfered with Plaintiff's right to receive the benefits of the contracts by constructively discharging Mr. Perez without "Cause" as defined under the contract while failing to order the immediate vesting of the then-remaining unvested shares of GLBL stock.

143.    This termination had the intended effect of depriving Mr. Perez of the stock benefits to which he was entitled under the GLBL Stock Agreement.

144.    Mr. Perez has been harmed in that he suffered the loss of benefits, equity award vesting, and other money that he would have received had the contract been fully performed.  As a result of such conduct, Mr. Perez has suffered damages in an amount according to proof.

**THIRD CAUSE OF ACTION**

**PROMISSORY ESTOPPEL**
**(Against GLBL and Chatila)**

145.    Plaintiff repeats and re-alleges the preceding allegations as if fully set forth herein.

146.    On behalf of GLBL, its Board and Defendant Chatila, Mr. Domenech promised Mr. Perez that if Plaintiff continued to work as COO and a director of GLBL after signing the GLBL Stock Agreements, GLBL would accelerate vesting of 50% of all unvested shares if Mr. Perez were terminated without Cause.

147.    Mr. Perez relied to his detriment upon the promise made by Defendant Chatila on behalf of GLBL and its Board and conferred benefit upon both Defendants.

148.    Mr. Perez was terminated by Defendant GLBL and the other Companies without Cause, but GLBL and Defendant Chatila have failed and refused to honor their promise to accelerate the vesting of 50% of Mr. Perez's unvested shares of GLBL.

149.    Mr. Perez is entitled to enforcement of that promise, or money damages to compensate him for Defendants' breach thereof.

## FOURTH CAUSE OF ACTION

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Against TERP)

150.    Mr. Perez repeats and re-alleges the preceding allegations as if fully set forth herein.

151.    Mr. Perez and Defendant TERP are parties to the TERP Stock Agreement dated January 31, 2014.  Every contract imposes the duty of good faith and fair dealing upon the parties in performance and enforcement of the contract.

152.    Mr. Perez performed all, or substantially all, of the significant actions that the contract required him to perform.

153.    Defendant TERP, acting in concert with the other Companies, acted in bad faith and unfairly interfered with Mr. Perez's right to receive the benefits of the contracts by constructively terminating his employment without "Cause" as defined under the contract while failing to order the immediate vesting of the then-remaining unvested shares of TERP stock.

154.    This termination had the intended effect of depriving Mr. Perez of the stock benefits to which he was entitled under the Second TERP Stock Agreement.

155.    Mr. Perez has been harmed in that he suffered the loss of benefits, equity award vesting, and other money that he would have received had the two contracts been fully

performed.  As a result of such conduct, Mr. Perez has suffered damages in an amount according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.   Two times the amount of back pay otherwise owed to the Plaintiff, with interest at the maximum legal rate;

B.   For any other money judgment representing compensatory damages including lost wages, earnings, stock award vesting, retirement benefits and other employee benefits, and all other sums of money, together with interest at the maximum legal rate on these amounts, according to proof;

C.   For a money judgment for mental pain and anguish and emotional distress, according to proof, with interest at the maximum legal rate, according to proof;

D.   For equitable and/or injunctive relief according to proof;

E.   For an award of punitive damages, according to proof;

F.   Compensation for litigation costs, expert witness fees, and attorneys' fees; and

G.   Such other and further relief for Plaintiff as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all claims so triable.

Respectfully Submitted,

/s/ Nicholas Woodfield
R. Scott Oswald
*Counsel for the Plaintiff*
Nicholas Woodfield
*Counsel for the Plaintiff*
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com

46

Kevin J. O'Connor (pending *pro hac vice*)
James L. Tuxbury (pending *pro hac vice*)
Rhiannon A. Campbell (pending *pro hac vice*)
*Counsel for the Plaintiff*
Hinckley, Allen & Snyder LLP
28 State St., 30th Floor
Boston, MA 02109
(617) 345-9000
(617) 345-9020 (facsimile)
koconnor@hinckleyallen.com
jtuxbury@hinckleyallen.com
rcampbell@hinckleyallen.com

56088188 v14